**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| **JASMINE C.**, an individual and on behalf of **M.C.**, a minor and her child; **J.P.**, a minor by and through his parents and next friends, **CRYSTAL P. and DANIEL P.**, individually and on behalf of a class of all similarly situated students; **ANDREA V.**, individually and on behalf of a class of all similarly situated parents; **ESTHER V.**, individually and on behalf of a class of all similarly situated teachers; **SYLVIA U.**, individually and on behalf of a class of all similarly situated school support staff; **Z.R.**, a minor by and through his parent and next friend, **CORINA R.**, individually; **J.S.**, a minor by and through his parent and next friend, **JENNIFER C.**, individually; **I.R.**, a minor by and through his parents and next friends, **ALMA R. and GEORGE R.**, individually; **L.R.**, a minor by and through her parents and next friends, **LUCIENE A. and FRANK R.**, individually; **Z.A.**, a minor by and through his parents and next friends, **ESTHER V. and LUIS A.**, individually; **M.T.**, a minor by and through her parent and next friend, **LOUANNA R.**; **B.G. and F.G.**, minors by and through their parent and next friend, **BEATRICE T.**, individually; **J.L.**, a minor by and through her parent and next friend, **ASHLEY L.**, individually; **J.D.**, a minor by and through his parent and next friend, **SANDRA V.**, individually; **F.L.**, a minor by and through her parent and next friend, **VIRGINIA G.**, individually; **A.P.**, a minor by and through his parents and next friends, **ARACELY P. and ROMAN P.**, individually; **A.L.**, a minor by and through his parent and next friend, **CRYSTAL G.**, individually; **D.J.Q.**, a minor by and through his parents and next friends, **MANUEL Q. and YVETTE Q.**, individually; **J.P.**, a minor by and through her parent and next friend, **JASMIN P.**, | Civil Action No.: **1:22-cv-01251-LY**<br><br><br>**AMENDED COMPLAINT FOR DAMAGES**<br><br>**CLASS/MASS ACTION**<br><br>1. **Negligence/ Gross Negligence**<br>2. **Negligence Per Se**<br>3. **Negligent Transfer**<br>4. **Negligent Sale**<br><br>**Jury Demand Pursuant to Fed. R. Civ. P. 38(b)** |

individually**; T.G.,** a minor by and through her parent and next friend**, JACKIE G.,** individually**; R.F.,** a minor by and through her parent and next friend**, MONICA O.,** individually**; A.V.** and **G.E.,** minors by and through their parents and next friends**, ANDREA V.,** individually**; N.S.,** a minor by and through her parent and next friend**, ALIETA P.,** individually and grandmother**, MARIA P.,** individually**; A.L.A.T.,** a minor by and through her parent and next friend**, CASSANDRA B.,** individually; **G.D.G.R.,** a minor by and through her parent and next friend**, CYNTHIA R.,** individually**; J.M.,** a minor by and through her parents and next friends**, SANDRA** and **MARTIN M.,** individually**; MARIA G.R.,** individually**; VANESSA G.,** individually**; M.D.E.,** a minor by and through her parents and next friends**, BERNARD E.** and **TANAMA J.E.,** individually**; A.R.,** a minor by and through her parent and next friend, **DEBORA Q.,** individually**; J.A.M.,** a minor by and through her parents and next friends, **LETICIA M.** and **MIKE M.,** individually**; M.C.A.,** a minor by and through her parent and next friend, **MONICA H.,** individually**; ALBERT V.,** individually**; A.G.,** a minor by and through her parent and next friend**, SELENA T.,** individually**; M.C.** a minor by and through her parent and next friend**, MARISA S.,** individually**; A.M.** a minor by and through her parent and next friend, **AIKO C.,** individually**;** and **DOES 1-3000,** individually**,**

> *Plaintiffs,*

v.

**DANIEL DEFENSE, LLC; DANIEL DEFENSE, INC; OASIS OUTBACK, LLC;** and **DOES 1-300,**

*Defendants.*

*"The way to right wrongs is to turn the light of truth upon them"*
-Ida B. Wells-

## I.

## NATURE OF THE ACTION

1.      Regrettably, this court must preside over yet another recurring and deeply tragic occurrence where, once again, elementary age children and their dedicated teachers have been murdered or physically and emotionally maimed by a deeply troubled young man wielding a semi-automatic machine gun, who, in his delusion colored by glorification of violence perpetuated by both video games and targeted Defendant Daniel Defense's advertisements, mercilessly released his own childhood trauma and pain upon unsuspecting beautiful and buoyant young children at school.

2.      This iteration of this now all too frequent tragedy, took place on May 24, 2022 at the Robb Elementary school, in Uvalde, Texas. On this fateful morning, Salvador Ramos ("Ramos") walked onto Robb's campus, armed with a Daniel Defense DDM4 V7 rifle and carrying hundreds of rounds of ammunition, and proceeded to murder 19 children and two teachers, while wounding at least another 17 other children. Uvalde is a close-knit, rural community located 80 miles from the United States and Mexican border. Robb Elementary is a member of Uvalde's Consolidated Independent School District ("CISD").

3.      Just barely eighteen years old, Ramos, who, despite never firing a gun, fantasized about the power and instant destruction that automatic guns could provide him. To manifest that fantasy, he turned to firearm manufacturer, Defendant Daniel Defense ("Daniel Defense" & "Daniel") who, due to a concerted and intentional marketing campaign specifically aimed at the

demographic of young, isolated, troubled, and violent young men, successfully won over and wooed Salvador Ramos.

4.      Daniel Defense targeted Ramos and other young men in his demographic by relying upon militaristic imagery that blatantly and unapologetically suggests that civilian consumers could (and should) use their weapons in the same manner as military servicemembers who rely upon their automatic weapons to engage in offensive combat missions: i.e., weapons purposefully designed to 'neutralize' as many enemy combatants as possible in the shortest time possible. Daniel Defense's marketing enhanced the import of this message by intentionally contracting with the very video game designers whose games most capture this particular demographics' attention and interest.

5.      Thus, Daniel Defense contracted with Activision, the developer, publisher and distributor of the first-person shooter game, *Call of Duty* in order to imbed their product within the game's premise while simultaneously advertising the product itself to ensure full and complete marketing immersion. Such intention was directed at the impressionable captive audience of repressed and insular young men who remained glued to the game for hours on end. Thus, it was no accident that a young man with a history of violence, who associated the military with killing people, and was fascinated with *Call of Duty* purchased a Daniel Defense AR-style rifle to carry out an offensive attack on civilians.

6.      Daniel Defense similarly relied upon social media outlets like Instagram in order to amplify their product placement, even suggesting through their messaging that consumers should (and could) reenact the video games in real life with, of course, Daniel Defense products in hand.

7.      It was by no means an accident that a young man with a history of violence and obsessed and addicted to playing *Call of Duty* with its hypnotic and dispassionate emphasis on the goal of killing people anxiously awaited his eighteenth birthday in order to purchase the AR-style weapon that he had been virtually shooting for incalculable hours over years at a time.

8.      In facilitating Ramos' fantasy into reality, Oasis Outback ("Outback"), the gun store in Uvalde who placed the guns and ammunition into Ramos's hands is equally responsible for the death, destruction and trauma that was unleashed on students, teachers, CISD staff, the citizens of Uvalde and the United States on May 24, 2022.

9.      It was readily apparent to individuals who witnessed Ramos' presence at Outback that he was not at all fit to purchase firearms. Despite all the indicia that reasonably raised doubts as to Ramos' fitness to purchase, i.e., a young man dressed head to toe in black attire in Uvalde, Texas who had expressed an urgency in wanting to purchase thousands of dollars of deadly weaponry within days of his eighteenth birthday, Outback's owner permitted the purchase to unfold, effectively providing him with an inordinate amount of guns, accessories, and ammunition that should have foreseeably raised significant flags of concern.

10.     As a federal firearms licensee, Oasis Outback had a legal duty to refrain from selling guns to prospective purchasers who it knew, or reasonably should have known, were planning to use them to harm others. Given the blatantly obvious red flags that Ramos presented, Oasis Outback's assent to the various sales is a glaringly obvious breach of its legal duty as a licensed procurer of arms and accessories.

11.     While Daniel Defense and Oasis Outback provided Ramos with the means to explosively unleash his rage, the various Defendant law enforcement authorities that both Plaintiff and the entirety of the citizens of Uvalde had placed their utmost trust and confidence in, had

5

woefully failed them, exponentially compounding the horrors that Ramos inflicted on May 24, 2022. Despite a mandatory requirement to comply with the State and local standard of unhesitatingly confronting and neutralizing the shooter without awaiting any affirmative order to do so, Defendant law enforcement officers, who initially responded and were on site in the building within three minutes of Ramos' entry, failed to follow such protocol. Thus, for approximately seventy-four minutes thereafter, the entirety of the local, state, and federal officers who showed up on the scene (all 376 of them) also failed to follow this mandatory protocol but instead, engaged in a uncoordinated travesty of inaction that made certain the death of the young children and their teachers, kept treatment from some who would have survived otherwise, and added to the physical injuries and emotional suffering that will forever follow those who were impacted on that fateful day of May 24, 2022.

## II.
## JURISDICTION AND VENUE

12.      Pursuant to 28 U.S. Code § 1332(d), jurisdiction in this Court is based on diversity of citizenship where like here, Plaintiffs are pursuing a mass/class action. Under the Class Action Fairness Act ("CAFA"), diversity jurisdiction exists in "class/mass actions" where the following requirements are met: (1) 100 or more plaintiffs; (2) common questions of law or fact between plaintiffs' claims; (3) minimal diversity, where at least one plaintiff is diverse from one defendant; and (4) aggregated claims in excess of $5 million. 28 U.S.C. § 1332(d)(2); 28 U.S.C. § 1332(d)(2).

13.      Pursuant to 28 U.S.C. §§ 2201 and 2202, this Court has jurisdiction to declare the rights of the parties and to grant all further relief deemed necessary and proper, as well as authority to provide injunctive relief under Rule 65 of the Federal Rules of Civil Procedure. Lastly, this Court has authority to award costs and attorneys' fees under 42 U.S.C. §§ 1988 and 3613(c)(2).

14.     Venue is proper within the Western District of Texas, Austin Division, under 28 U.S.C. § 1391(b)(1) and (2) because Defendants regularly conduct business in this district, and the events and omissions giving rise to Plaintiffs' claims occurred within this district.

### III.

### PARTIES

**Plaintiffs**

15.     Plaintiff **Jasmine C.,** who was working in the cafeteria, and her son Plaintiff, **M.C.,** a minor who was ten years old in fourth grade on May 24, 2022 when he was in attendance in Room 103 at Robb Elementary, are residents of the State of Texas.

16.     **Plaintiff Student Class Representative J.P.** is a minor student who was ten years old when he was in attendance at Robb Elementary on May 24, 2022. **J.P.**'s parents, Plaintiffs **Daniel and Crystal P.** are suing Defendants on **J.P.**'s behalf. Plaintiff **J.P.** is also suing Defendants on behalf of the class of students who were on the premises of Robb Elementary on May 24, 2022 and who sustained emotional and psychological damages as a result of Defendants' conduct and omissions on that date. **J.P.** and his parents, Plaintiffs' **Daniel P.** and **Crystal P.** are the parents and legal guardians of J.P., who, as a family, reside in Uvalde, Texas.

17.     **Plaintiff Parent Class Representative**, **Andrea V.**, is a parent of minor, **A.V**. and **G.E.** is suing Defendants on behalf of herself, **A.V.** and the putative class of parents of children who were in attendance at Robb Elementary on May 24, 2022. Plaintiffs **A.V.** and her sister **G.E.** were nine years old in fourth grade and seven years old in third grade respectively on May 24, 2022 while in attendance at Robb Elementary. **A.V.** was in lockdown in Room 105 while **G.E.** was on recess in the playground at the time of the shooting. Plaintiff **Andrea V.** is the parent and legal guardian of **A.V.** and **G.E.,** who, as a family, reside in Uvalde, Texas.

18.     **Plaintiff Teacher Class Representative, Esther V.** was in attendance at Robb Elementary on May 24, 2022 serving as a teacher's assistant in Room 31 and 32 and is a resident of Uvalde, Texas. Ms. Esther V. is suing Defendants on behalf of herself, and the putative class of teachers employed by CISD who were on the premises of Robb Elementary on May 24, 2022. **Ms. Esther V.** is a resident of Uvalde, Texas.

19.     **Plaintiff Support Staff Class Representative Sylvia U.** was driving school bus number 19 on May 24, 20222 serving as an employee of the School District as a Bus Driver and is a resident of Uvalde, Texas. Ms. Sylvia U. is suing Defendants on behalf of herself, and the putative class of teachers employed by CISD who were on the premises of Robb Elementary on May 24, 2022.

20.     Plaintiff **Z.R.** was ten years old in fourth grade on May 24, 2022 when he was in attendance in Room 109 at Robb Elementary. Plaintiff **Corina R.** is the parent and legal guardian of Z.R., who, as a family, reside in Uvalde, Texas.

21.     Plaintiff **J.S.** was eight years old in third grade on May 24, 2022 when he was in attendance in Room 19 at Robb Elementary. Plaintiff **Jennifer C.** is the parent and legal guardian of S.J., who, as a family, reside in Uvalde, Texas.

22.     Plaintiff **I.R.** was eight years old in second grade on May 24, 2022 when he was in attendance in Room 19 at Robb Elementary. Plaintiffs **George and Alma R.** are the parents and legal guardians of I.R. who, as a family, reside in Uvalde, Texas.

23.     Plaintiff **L.R.** was nine years old in third grade on May 24, 2022 when she was in attendance and in the cafeteria at Robb Elementary. Plaintiffs **Frank R. and Luciene A.** the parents and legal guardians of L.R. who, as a family reside in Uvalde, Texas.

24.     Plaintiff **Z.A.** was nine years old in third grade on May 24, 2022 when he was in attendance in room 2 at Robb Elementary. Plaintiffs **Esther V.** and **Luis A.** are the parents and legal guardians of Z.A. and on May 24, 2022 was working at Robb Elementary as a teacher's assistant and was in lockdown in Room 31 and 32 during the seventy-seven minute stand-off at Robb Elementary. Both Z.A. and his parents, Ms. V. and Mr. A. reside in Uvalde, Texas.

25.     Plaintiff **M.T** was nine years old in third grade on May 24, 2022 when she was in attendance in room 1 at Robb Elementary. Plaintiff **Louanna R.** is the parent and legal guardian of M.T and as family, reside in Uvalde, Texas.

26.     Plaintiffs **B.G**. and brother **F.G.** were eight years old in third grade and seven years old respectively on May 24, 2022 when they both were in attendance on recess outside on the playground at Robb Elementary when the shooting commenced on the campus. Plaintiff **Beatrice T.** is the parent and legal guardian of both B.G. and F.G and together, as a family, reside in Uvalde, Texas.

27.     Plaintiff **J.L.** was seven years old in third grade on May 24, 2022 when she was in attendance at Robb Elementary outside on the playground at the time of the shooting commenced on campus. Plaintiff **Ashley L.** is the parent and legal guardian of J.L. and together as a family, reside in Uvalde, Texas.

28.     Plaintiff **J.D.** was ten years old in fourth grade on May 24, 2022 when he was in attendance in Room 109 at Robb Elementary. Plaintiff **Sandra V.** is the parent and legal guardian of J.D. who, as a family, reside in Uvalde, Texas.

29.     Plaintiff **F.L.** was seven years old in third grade on May 24, 2022 when she was in attendance at Robb Elementary and hiding on the cafeteria's stage during the shooting.

Plaintiff **Virginia G.** is the parent and legal guardian of F.L. who, as a family, reside in Uvalde, Texas.

30.     Plaintiff **A.P.** was eight years old and in third grade on May 24, 2022 when he was in attendance at Robb Elementary. Plaintiff **Roman P. and Aracely P.** are the parents and legal guardians of A.P. who, as a family, reside in Uvalde, Texas.

31.     Plaintiff **A.L.** was eight years old in third grade on May 24, 2022 when she was at recess at Robb Elementary. Plaintiff **Crystal G.** is the parent and legal guardian of A.L., who, as a family, reside in Uvalde, Texas.

32.     Plaintiff **D.J.Q.** was eight years old in third grade on May 24, 2022 when in attendance outside on the school grounds near his classroom, Room 8. Plaintiffs **Manuel Q. and Yvette Q.** are the parents and legal guardians of D.J.Q, who, as a family, reside in Uvalde, Texas.

33.     Plaintiffs **J.P.** was seven years old and in second grade on May 24, 2022 when in attendance in Room 17 at Robb Elementary. Plaintiff **Jasmin P.** is the parent and legal guardian of J.P. who, as a family, reside in Uvalde, Texas.

34.     Plaintiffs **T.G.** was eight years old and in second grade on May 24, 2022 and was in attendance in Room 18 at Robb Elementary. Plaintiff **Jackie G.** is the parent and legal guardian of T.G. who, as a family reside in Uvalde, Texas.

35.     Plaintiffs **R.F.** was nine years old and in fourth grade on May 24, 2022 when in attendance at Robb Elementary. Plaintiff **Monica O.** is the parent and legal guardian of R.F., who, as a family, reside in Uvalde, Texas.

36.     Plaintiffs **N.S.** was nine years old and in third grade on May 24, 2022 when in attendance in Room 12 at Robb Elementary. Plaintiffs **Alieta P.** is the parent and legal guardian of N.S. and Maria P. is the grandmother of N.S., who, as a family, reside in Uvalde, Texas.

37.     Plaintiffs **A.L.A.T** was ten years old and in fourth grade on May 24, 2022 while in attendance in Room 302 at Robb Elementary. Plaintiffs **Cassandra B.** is the parent and legal guardian of A.L.A.T, who, as a family, reside in Uvalde, Texas.

38.     Plaintiff **G.D.G.R.** was seven years old and in third grade on May 24, 2022 while in attendance at Robb Elementary. Plaintiff **Cynthia R.** is the parent and legal guardian of G.D.G.R, who, as a family reside in Uvalde, Texas.

39.     Plaintiff **J.M.** was nine years old and in fourth grade on May 24, 2022 while in attendance at Robb Elementary. Plaintiffs **Sandra and Martin M.** are the parents and legal guardians of J.M. who, along with J.M. reside in Uvalde, Texas.

40.     Plaintiff **Maria G.R.** was a bus driver for CISD on May 24, 2022, while on location at Robb Elementary. Ms. G.R. resides in Uvalde, Texas.

41.     Plaintiff **Sylvia U.** was a bus driver for CISD on May 24, 2022, while on location at Robb Elementary. Ms. U. resides in Uvalde, Texas.

42.     Plaintiff **Vanessa G.** was a bus driver for CISD on May 24, 2022, while on location at Robb Elementary. Ms. G. resides in Uvalde, Texas.

43.     Plaintiff **M.D.E.** was nine years old and in Room 32 on May 24, 2022 at Robb Elementary School. Plaintiffs **Tanama J.E. and Bernard E.** are the grandparents and legal guardians of **M.D.E.** who, as a family, reside in Uvalde, Texas.

44.     Plaintiff **A.R.** was ten years old and in Room 109 on May 24, 2022 at Robb Elementary School. Plaintiff **Debora Q.** is the parent and legal guardian of **A.R.** who, as a family reside in Uvalde, Texas.

45.     Plaintiff **J.A.M.** was ten years old and in Room 104 on May 24, 2022 at Robb Elementary School. Plaintiffs **Leticia M.** and **Mike M.** are the parents and legal guardians of **J.A.M.** who, as a family, reside in Uvalde, Texas.

46.      Plaintiff **M.C.A.** was nine years old and in the cafeteria on May 24, 2022 at Robb Elementary School. Plaintiff **Monica H.** is the parent and legal guardian of **M.C.A.** who, as a family, reside in Uvalde, Texas.

47.     Plaintiff **Albert V.** was on Geraldine Street on May 24, 2022 helping a friend with his vehicle. He heard the gunman crash and ran to the vehicle to ask if he needed help, he says the gunman got out of his vehicle, saw him drop a second AR rifle to the side of his pick-up truck and started shooting towards Plaintiff.

48.     Plaintiff **A.G.** was nine years old and in the cafeteria on May 24, 2022 at Robb Elementary School. Plaintiff **Selena T.** is the parent and legal guardian of **A.G.** who, as a family, reside in Uvalde, Texas.

49.     Plaintiff **M.C.** was ten years old and in Room 102 on May 24, 2022 at Robb Elementary School. Plaintiff **Marisa S.** is the parent and legal guardian of **M.C.** who, as a family, reside in Uvalde, Texas.

50.     Plaintiff **A.M.** was ten years old and Room 102 on May 24, 2022 at Robb Elementary School. Plaintiff **Aiko C.** is the parent and legal guardian of **M.C.A.** who, as a family, reside in Uvalde, Texas.

51.     Plaintiff Does 1-3000 are students, teachers, support staff and parents who were either within the perimeter of Robb Elementary School on May 24, 2022 or were parents outside Robb's perimeter on that date but had children who were on the school's campus on May 24, 2022. This action will be amended to include the Doe Plaintiffs 1-3000 when their identities have been ascertained and discovered as to each element of each cause of action against each of the named Defendants herein.

## Defendants

52.     Defendant **Daniel Defense**, LLC, is a Georgia limited liability company that manufactured and marketed the firearm that Salvador Ramos used to cause irreparable and forever lasting harm to Plaintiff and the lives of the people of Uvalde, Texas. Its principal place of business is 101 Warfighter Way, Black Creek, Georgia 31308, where it may be served with process by its registered agent and Chief Executive Officer ("CEO"), Marvin C. Daniel. Daniel Defense, LLC also does business under the name Daniel Defense, Inc., which has an identical control number registered with the Georgia Secretary of State. Collectively, Daniel Defense, LLC and Daniel Defense, Inc. are referred to herein as "Daniel Defense" or Daniel."

53.     Defendant **Oasis Outback, LLC** ("Oasis Outback"), is a Texas limited liability company that transferred the weapon used by Ramos to inflict gruesome and incalculable harm to those on the premises of Robb Elementary school on May 24, 2022, as well as those intimately connected with those on the premises on that fateful day. Oasis Outback also sold Ramos another AR-15-style weapon and hundreds of rounds of ammunition. Its principal place of business is 2900 East Main Street, Uvalde, Texas 78801, and it may be served with process by serving its registered agent and CEO, William R. Klein, at 236 East Nopal Street, Uvalde, Texas 78801.

## IV:

## GENERAL ALLEGATIONS

**A.   Daniel Defense and its role in the shooting on May 24, 2022.**

54.     The mass shooting that took place at Robb Elementary was integrally enabled by the illegal, reckless and negligent actions of Defendant Daniel Defense, LLC, which egregiously profited from the unfair marketing of its AR-15 rifles, including the DDM4 V7 rifle that Salvador Ramos obsessed over and ultimately purchased just days after his eighteenth birthday. Due to Daniel's concerted and perverse campaign targeting violent and anti-social boys and men who are attracted to Daniel's message that weapons designed for rapid killing during warfare are somehow transferable and applicable to civilians under non-combative circumstances.

55.     Daniel Defense markets its products to adolescent and young men by relying on a barrage of targeted media, including social media content, product placements, and print advertising. For example, Daniel Defense promotes its products heavily on Instagram, a platform populated by young social media users. Daniel Defense also places its products in video games, and in so doing, heavily promotes the video game tie-ins in the company's social media accounts.

56.     Daniel Defense's marketing includes militaristic and combat imagery as well as content specifically aimed at young consumers that both references video games (particularly the ones that expressly highlight their product placement inside the games) and violence obsessed internet meme culture. This has enabled Daniel Defense to appeal to young boys who are effectively being primed as prospective customers of their military styled AR-15 rifles once they reach the legally permitted age for purchase. [1]   Thus, Daniel unforgivably fosters its present and

---

[1] *See* Aimee Picchi, *#Gunporn #pewpew: How gunmakers market firearms to young Americans*, CBS News (June 8, 2022), https://www.cbsnews.com/news/gun-assault-weapons-young-americans-ar-15-gun-control/.

future market growth by appealing to traumatized youth obsessed with all things military and their romanticization of its end game of killing and destruction.

57.     According to the Oversight Committee of the U.S. House of Representatives, "Ninety percent of [Daniel Defense]'s sales are direct to civilian consumers, but the company's marketing emphasizes the tactical nature of its products."  This is no accident. Daniel Defense has marketed its rifles to civilian consumers in a manner that appeals to the subset of adolescents and young men attracted to violent combat and military fantasies while expressly implying that civilians can use their weapons for offensive combat-like missions. Such marketing and rhetoric significantly increases the risk that one of these adolescents or young men will use their rifles to perpetrate an act of mass violence.

58.     Daniel Defense's marketing includes militaristic and combat imagery as well as content specifically aimed at young consumers, referencing video games and the irreverent tone of internet meme culture. This has enabled Daniel Defense to appeal to young male civilian consumers, which can in turn translate to market growth by priming young buyers to purchase AR-15-style rifles as soon as they are legally able.

59.     Daniel Defense markets its products to adolescent and young men using a range of channels, including social media content, product placements, and print advertising. For example, Daniel Defense promotes its products heavily on Instagram, a platform with a young user base. The company does not use "age-gating" to limit access to its social media accounts to those who cannot legally purchase guns. Daniel Defense also places its products in video games, and then heavily promotes the video game tie-ins in the company's social media accounts

60.     Thus, Ramos was the quintessential customer for Daniel Defense: a troubled, violence obsessed loner who spent much of his free time on the internet and social media

fantasizing about reenacting video game combat in real time and place. Daniel Defense is well apprised of the risks that its marketing strategy poses and is purposeful in its presentation, knowing that its future consumer base is attentive to its messaging of militaristic imagery and the cultural and emotional 'warfare' that has hijacked the hearts and minds of this susceptible and vulnerable demographic. The shooting at Robb Elementary was an all-too-foreseeable result of Daniel Defense's intentionality of marketing its products in a manner that encourages their illegal use.

### 1.  The DDM4 V7 is a Military-Inspired Rifle

61.     Daniel Defense currently manufactures and sells over two dozen models of semiautomatic rifles, including 21 models of AR-15-style rifles and eight large-caliber models of AR-10-style rifles. Unlike many manufacturers of firearms, Daniel Defense sells its firearms directly from its website (in addition to selling through third-party sellers).

62.     The DDM4 V7 rifle—the assault rifle used by  Ramos—comes equipped with a high-capacity, 32-round magazine and a magazine-well that is designed "for the fastest, most secure reloads possible."[2]  Daniel Defense has explained that the "M4" in "DDM4 V7" is a nod to the "iconic M4 carbine used by U.S. military forces," after which Daniel Defense models its DDM4 rifles. [3]

63.     Like all AR-15-style rifles, Daniel Defense's DDM4 V7 rifle is an offspring from the military rifles developed and designed to efficiently kill soldiers on the battlefield.

---

[2] Daniel Defense, *DDM4 V7*, https://danieldefense.com/ddm4-v7.html; *DD Magazine*, https://danieldefense.com/dd-magazine.html (both last accessed June 8, 2022).
[3] Daniel Defense, *Comparing the Features of the Daniel Defense Rifle Line*, https://danieldefense.com/wire/firearm-features (last accessed June 8, 2020); Michael Daly, *Daniel Defense, the Maker of the Uvalde Shooter's 'Perfect Rifle,' Abruptly Exits the NRA Convention*, The Daily Beast (May 26, 2022), https://www.thedailybeast.com/daniel-defensethe-maker-of-the-uvalde-shooters-perfect-rifleabruptly-exits-the-nra-convention.

64.     Thus, in order to sell its $2,000 AR-15-style rifles with limited legitimate civilian uses beyond a thrill of shooting a military grade weapon at the shooting range (or showing off to one's friends), Daniel has marketed and promoted the use of its product as one quintessentially perfect for illegal and dangerous misuse.

### 2.   Marketing Military Combat Weapons to Impressionable Young Men and Boys

65.     Daniel Defense regularly promotes its weapons and accessories through appeals to civilian consumers attracted to the military with its connotations of combat that evoke thrill, excitement, violence in the name of conquering the enemy. While many of Daniel's competitors extol the virtues of military services as enticement to purchase their firearms, Daniel expressly markets its products as the means by which to undertake offensive civilian, combat-like missions. i.e., Daniel's advertisements encourage civilian viewers to imagine that their products automatically imbue them with soldier-like status and that the missions and possibilities available to servicemembers are also available to them.



**Daniel Defense** ✔
@DanielDefense

Train up a child in the way he should go, and when he is old, he will not depart from it. 🙏



12:26 PM · May 16, 2022 · Twitter for iPhone



*Image from Daniel Defense 2022 print catalog*

66.    Other Daniel Defense ads contain suggestions that their products can be used by civilians undertaking combat-style operations against other civilians. See the advertisement below depicting a point of view through a rifle scope targeting a citizen non-combatant that suggests an impending assassination.



*Instagram (Mar. 2, 2022*

67.     Another social media advertisement shows three men in military fatigues, with weapons drawn as they climb a set of stairs on a freighter, as if in a combat situation. Such advertisements suggest that Daniel's guns are integral in providing the props for 'boys' to reenact wartime exercises directed at civilians.



68.     Despite solely targeting a civilian market, Daniel Defense markets its AR-15-style rifles as if it were targeting U.S. Servicemembers. For instance, the company created a social media campaign directed at young males with a hashtag, #gunporn, that encourages "MK18 Mondays," referring to a soldier's 'close contact' encounters and the benefits of Daniel's MK18 under those

circumstances.



*Instagram (Oct. 11, 2021)*

69.    The company's marketing sometimes intersperses online meme culture with combat imagery to sell military-grade weaponry to the civilian population. In the following two posts, the company trades on the "Heading into the weekend" meme.



*Instagram (May 6, 2021)*



*Instagram (June 25, 2021)*

70.     Along with Instagram content and print advertisements, Daniel Defense has produced videos depicting fictional military service members using its weapons as a means of marketing its AR-15 rifles to civilians.

71.     In one such video posted on the company's website and on YouTube, Daniel Defense introduced a "revolutionary" new rifle that pairs the company's "DD4 lower receiver" with its rail system[4] "modeled after the proven RIS II developed for SOCOM." The pitch assumes that the target civilian consumer understands, without being told, that "SOCOM" stands for "Special Operations Command," and trades on the cachet and attraction of U.S. special operations soldiers. The video intercuts footage of a civilian target shooter with footage of what appears to be an armed military team moving in formation, all synchronized to a heart pounding rhythm. Daniel however provides no warning of the dangers of trying this at home; rather the message is the opposite: "You too could be a soldier on mission during the weekend!"

---

[4] A rail system on an AR-15-style rifle allows users to mount various optics — including iron sights, scopes, and holographic sights — as well as lights, aiming lasers, grips, and other accessories in various positions along the length of the rail system. In general, it allows consumers to customize their AR-15-style rifles.



*Still image from Daniel Defense promotional video. YouTube (Jan. 18, 2022)*

72.     Another video below portrays a (fictional) military raid on a campus of abandoned buildings, one of which appears, hauntingly enough, to be a former school building. It features sweeping shots of a dramatic helicopter arrival, professional stunt work, and suspense-building soundtrack, all in the name of promoting Daniel Defense's rifles as military-grade, special-operations-approved weapons that expressly target the civilian market.



**Daniel Defense MILE (Military & Law Enforcement) Brand Video**
73,057 views  Jan 9, 2017

*Still image from Daniel Defense promotional video. YouTube (Jan. 9, 2017)*

73.     Daniel Defense's video marketing frequently depicts military and law enforcement operations encouraging the civilian consumer to "use what they use." While the U.S. government does buy certain firearm components from Daniel Defense (including rail systems), the only publicly available documentation indicates that aside from a small, limited-time contract for the sale of rifles to the U.S. Navy in 2018, the company does not in fact sell its complete line of rifles or firearms to the U.S. military. Thus, its marketing is solely directed at the civilian market.

74.     Daniel Defense has chosen to aggressively market its rifles so that consumers will associate them with the U.S. and foreign militaries. The company's strategy is to position itself as a purveyor of weapons trusted by real-life soldiers, thereby eliciting the military aspirations and fantasies held by many young male civilian consumers, i.e., one can enjoy and manifest the power and associated gear without the discipline and hard work of enlistment. Daniel Defense's

26

marketing impermissibly and unfairly suggests that consumers should use Daniel Defense rifles to reenact combat, i.e., "extremely maneuverable and easy to move around barriers," even on American streets. For a young consumer, like Salvador Ramos, who was attracted to the excitement and risk of combat missions and thus highly susceptible to suggestive marketing, Daniel Defense offers him and his young demographic, a taste of the military experience via its weapons.

### 3.  Marketing Through Video Games

75.     Daniel Defense also markets its rifles by placing them in violent first-person-shooter video games. This form of marketing appeals to young, disaffected men who are a demographic that is susceptibly influenced by violent imagery. It amplifies its product placement through online and social media channels. The Daniel Defense DDM4 V7S rifle—a short-barreled version of the DDM4 V7, the weapon utilized by Ramos, is featured in the video game, *Call of Duty*: *Modern Warfare.* Daniel leverages this association throughout the company's social media accounts by referencing and tagging *Call of Duty* in many of its posts:



*Facebook (Oct. 25, 2019)*



*Caption reads: "The circle is closing…," a reference to an obstacle called "Circle Collapse" that occurs in Call of Duty: Warzone. Instagram (June 7, 2021)*

76.     *Call of Duty* is a game that allows users to have a "first-person" experience of being in the military, i.e., it provides the user with a point-of-view experience of shooting at others as if in combat. It simulates being in a war zone with an AR-15 rifle styled after those manufactured by Daniel Defense. First-person-shooter video games like *Call of Duty* are extremely popular among teenagers and young adults, including the Uvalde, Buffalo, Parkland, and El Paso mass shooters.[5] Daniel Defense has most significantly benefited from the use of AR-15-style rifles in *Call of Duty*. In social media posts, Daniel Defense uses hashtags such as #callofduty and #cod to make its *Call of Duty* references explicit.[6] It is readily apparent that both Daniel Defense and Activision, the owner of *Call of Duty,* are engaged in extensive contractual relations whereby the two have significantly benefited from targeting young impressionable children.

77.     Daniel Defense promotes its connection to the *Call of Duty* franchise with staged photos in its social media feeds, featuring actors dressed like the video game avatars with Daniel Defense weapons in hand on sets designed to look like settings within the game. The not-so-subtle

---

[5] *See* Nicholas Bogel-Burroughs, *The Texas gunman had few friends in high school, classmates say*, N.Y. Times (May 25, 2022), https://www.nytimes.com/2022/05/25/us/texas-shooting-gunman-bullied.html; *Video games and violence, explained*, The Week (Sep. 15, 2019), https://theweek.com/articles/864451/video-games-violence-explained; Megan O'Matz, *Violent video games may have primed the Parkland school shooter*, South Florida Sun-Sentinel (Apr. 29, 2019), https://www.sun-sentinel.com/local/broward/parkland/florida-school-shooting/fl-ne-nikolas-cruz-mental-health-services-20190425-story.html; (Emily Guskin, *Teenagers are fueling a competitive gaming tidal wave*, The Washington Post (Mar. 9, 2018), https://www.washingtonpost.com/news/sports/wp/2018/03/09/teenagers-are-fueling-an-e-gaming-tidal-wave/.

[6] *See, e.g.*, Daniel Defense Instagram posts dated September 28, 2021 (https://www.instagram.com/p/CUX4q0BJ3UV/) and November 19, 2020 (https://www.instagram.com/p/CHygY-el9GD/).

message to young consumers (like Salvador Ramos) is that Daniel Defense products can be used to reenact *Call of Duty* fantasies.



*Caption reads: "Verdansk never looked so good. Tag your Duos buddy below!" "Verdansk" is the name of a fictional city in the Call of Duty franchise. [7] "Duos" is a term referring to a pair of people who play a video game together in a specific "duos" game mode. Instagram (May 26, 2021)*

### 4. Pop Culture and Marketing to Teens

78.     Daniel Defense's marketing also draws on pop culture themes and relies on online meme culture to attract teens, many of whom are too young to legally purchase a firearm. The company has engaged in marketing stunts to generate "viral" internet activity and publishes content referencing celebrities and pop culture characters that are popular with teenagers.

79.     Unlike many other consumer brands, Daniel Defense however uses these tactics, including a strong reliance on viral meme culture, to sell highly lethal weapons—the kind that are used by young, disaffected mass shooters. Daniel Defense knew that the young people they target as consumers have used AR-15s-styel rifles in mass shootings ranging from Sandy Hook to

---

[7] *Verdansk*, CallofDuty.com (accessed on June 6, 2022), https://www.callofduty.com/warzone/strategyguide/tac-map-atlas/verdansk-north.

Buffalo to El Paso to Dayton to Parkland. Thus, Daniel Defense's bread and butter AR-15s are effectively the proverbial weapon of choice for school mass shooters in the United States.

80.     For example, on Halloween of 2021, Daniel Defense tweeted out this picture of a tattooed man wearing a jack-o-lantern on his head, carrying a Daniel Defense rifle, and packing several additional large-capacity magazines in a carrier on his chest. The caption of the post asked viewers what costume they had chosen. This sort of content that actively engages users by asking them to comment on the post appeals to the younger user base of Instagram.



*Twitter (Oct. 31, 2021)*

81.     The same applies to Daniel's image of Santa Claus, smoking a cigar and holding a Daniel Defense MK18 assault rifle. The image upends traditional Christmas imagery mixing

military themes with Santa Claus—a childhood icon. This form of mixing jokes and pranks with

hyper-masculinity has particular appeal to teens and young males.



*Instagram (Dec. 27, 2021)*



*Individual dressed as an executioner from Squid Game, a hyperviolent Netflix show. Instagram (Oct. 31, 2021*

82.     The company also appeals to younger consumers by posting images of celebrities holding its products, as in the image below, which is captioned, "MK18 got me feeling like a rock star." The post also uses the #gunporn and #pewpew hashtags, both of which are designed for younger consumers immersed in online culture.

33



*Image of Post Malone, a popular musician and producer, holding a Daniel Defense rifle. Instagram (Jan. 23, 2020)*

### 5. Daniel Defense's Marketing Causes Harm

83.     Teenagers and young men comprise a disproportionate share of the nation's most destructive mass shooters. They are the group most likely to internalize Daniel Defense's promotion of their rifles amenability to illegal and offensive civilian use. Daniel Defense markets AR-15-style rifles against the backdrop of decades of mass shooters selecting these rifles to commits acts of horrific violence.

84.     From Parkland to El Paso to Uvalde, AR-15-style rifles have been the weapon of choice for the young male shooters who disproportionately commit the most destructive mass

shootings. [8]  Daniel Defense is well aware of these facts yet perpetuates is insidious marketing campaign.

85.     Through its marketing, Daniel Defense exploits the heightened susceptibility of teenage boys and young men to produce advertising that plays on this group's propensities for risky and violent behavior.

86.     This marketing strategy was intentionally created to elicit controversy, seek out meme-able content, and propagate violent combat imagery that was intentionally designed to appeal to young, video-game-playing men and boys, like Salvador Ramos.

87.     In directing much of its advertising at young men and adolescents, Daniel Defense chooses to target a group that is particularly susceptible to advertising and most likely to misuse Daniel Defense's products.

88.     Decades of scientific evidence demonstrate that the onset of intense, thrill-seeking urges associated with puberty outpaces the development of the area of the brain responsible for judgment and impulse control, which continues into young adulthood. As a result, adolescents and post-adolescents have less capacity for mature judgment and self-control than older adults and are more likely to engage in risky behaviors. Thus adolescents and young men are more susceptible to advertising: research indicates that young people are particularly receptive to advertisements that depict impulsive, thrill-seeking behavior. This susceptibility has been similarly exploited by

---

[8] Additionally, the arsenal of the 64-year-old Las Vegas shooter, who killed 58 people and injured 413 more, included two AR-15-style rifles manufactured by Daniel Defense. *See* Timothy Bella, *Families sue Uvalde gunman, signal possible action against gunmaker*, The Washington Post (Jun. 6, 2022), https://www.washingtonpost.com/nation/2022/06/04/uvalde-shooting-lawsuits-daniel-defense-marketing/.

tobacco and alcohol advertisements that promote thrill-seeking conduct to hook young consumers early and convert them into lifelong purchasers of their products. [9]

89.     At the same time, adolescents and young adults are more likely than other age group to engage in risky, thrill-seeking, violent, and impulsive behavior. Research shows that adolescents and post-adolescents have less capacity for mature judgment and self-control than older adults and are more likely to engage in risky behaviors.  Young people's predilection for risky, thrill-seeking behavior fully accounts for high percentage of young males committing crimes and becoming ensnared in the criminal justice system.

90.     A disproportionate amount of violent crime in the United States is committed by individuals between the ages of 15 and 24, and 18- to 20-year-olds are offenders in gun homicides at a rate nearly three times higher than adults 21 and older.

91.     Daniel Defense knew that certain adolescents and young adult men are susceptible to advertising that plays on negative emotions and are particularly at risk of misusing AR-15 rifles, including the DDM4 V7.

92.     Despite this knowledge, Daniel Defense continues to market the DDM4 V7 in a manner that would appeal to thrill-seeking young men, who desire the power and destruction of a military weapon, with full knowledge and appreciation that the increase in sales of DDM4 V7 was

---

[9] *See* Center on Alcohol Marketing and Youth, *Alcohol Advertising and Youth*, John Hopkins Bloomberg School of Public Health (2007) ("Research clearly indicates that, in addition to parents and peers, alcohol advertising and marketing have a significant impact on youth decisions to drink."), http://www.camy.org/resources/fact-sheets/alcohol-advertising-and-youth/; John J. Pierce et al., *Ass'n Between Receptivity to Tobacco Advertising and Progression to Tobacco Use in Youth and Young Adults in the PATH Study*, 172 JAMA Pediatrics 444 (2018) ("Our study reinforces that tobacco product marketing continues to be an important contributor to tobacco use among young people."), https://jamanetwork.com/journals/jamapediatrics/fullarticle/2676069

due in part to its appeal to a younger demographic of users. Daniel Defense's continuation of this kind of marketing campaign foreseeably led to the mass shooting in Uvalde.

## V: STATEMENT OF FACTS

### A. Pre May 24, 2022 Attack

#### 1. Salvador Ramos

93.     The eighteen-year-old Uvalde resident Salvador Ramos significantly fit the profile of other school shooters. His home life and upbringing were riddled with trauma that lead him down a path of alienation and withdrawal which was further met with bullying and ridicule. It is not a coincidence that Ramos intentionally targeted fourth grade students as he himself was the subject of protracted bullying in his fourth grade year. Thereafter, Ramos withdrew from attending classes so that by 2021, at age seventeen, he had only completed ninth grade.

94.     After withdrawing from school, Ramos spiraled down a dark path with his friends taunting him as a "school shooter." Alienated, Ramos found himself indulging in first person shooter video games, including *Call of Duty* and *Grand Theft Auto*.

95.     Ramos associated military service with killing people, an association which was heightened by Ramos's obsession with first-person-shooter games like *Call of Duty*, which he obsessively played. Games like *Call of Duty* can have an outsized influence on the lives of teenagers, particularly teenagers like Ramos who are socially isolated, traumatized, and needing to respond to difficult home environments.

96.     Ramos found the attention he was seeking on social media by depicting himself as a cold hearted, violent and aggressive character who displayed dead animals and play-acted a rageful gun shooter wearing body armor. Ramos hinted on social media that he intended to engage in a school shooting and that he welcomed attention and notoriety

97.     Although seventeen in 2021, Ramos attempted to effectuate "straw" gun purchases and began to amass gun accessories including body carrier armor. Simultaneous with his purchases, Ramos began to increase vocalizing his obsession with school shootings. Upon his eighteenth birthday on May 16, 2022, Ramos immediately purchased a Daniel Defense DDM4 V7 (an AR-15 style rifle) that he had shipped to the Oasis Outback gun store in Uvalde.

98.     AR-15-style rifles, like Daniel Defenses' DDM4 V7, discharge high rates of fire and rounds that are larger and travel much faster than handgun bullets. This combination results in its bullets attaining significantly more kinetic energy such that when they strike a person, the resulting damage is staggering. While handgun bullets typically travel in a linear path through the body and create relatively small entry and exit wounds, AR-15 rounds hit the human body with such speed that they can shred organs, destroy large swaths of tissue, and leave exit wounds "the size of an orange."[10]

99.     Daniel Defense's unscrupulous and exploitative marketing tactics took full and complete advantage of Ramos, by effectively placing their AR-15 into his mind through its advertising, making explicit an unmistakable link between military missions and civilian undertakings like a school mass shooting.

100.     One day after purchasing Daniel's DDM4 V7, Ramos purchased another rifle, a Smith and Wesson M&P15, as well as 1,740 rounds of ammunition which again he picked up at Oasis Outback. A background check was conducted, and despite Ramos making multiple gun purchases within a short period of time and therefore should have been mandatorily reported to the Bureau of Alcohol, Tobacco and Firearms ("ATF"), Ramos passed his background checks.

---

[10] Heather Sher, *What I Saw Treating the Victims From Parkland Should Change the Debate on Guns*, The Atlantic (Feb. 22, 2018), https://www.theatlantic.com/politics/archive/2018/02/what-i-saw-treating-the-victims-from-parkland-should-change-the-debate-on-guns/553937/.

### 1.   Daniel Defense's Marketing Was a Proximate Cause of Harms to Plaintiffs

101.    Daniel Defense's marketing of its rifles to teenage and young adult men contributed to the shooting at Robb Elementary, and is responsible, in part, for the physical and emotional injuries sustained by Plaintiffs. Daniel Defense markets its AR-15-style rifles to young male consumers by using militaristic imagery and video game references on various social media platforms suggesting that its rifles can be used by civilians for offensive combat-style operations against non-combatants. These advertisements are tailor-made for someone like Ramos: a loner with a history of making violent threats, an obsession with first person shooter video games, violence, and gore, and a prolific user of social media, including, but not exclusively, Instagram and Facebook.

102.    Daniel Defense's unfair and illegal marketing tactics successfully found fertile ground in Ramos' world. Despite the fact that Ramos knew little about guns nor had he previously held or fired one, Daniel Defense's marketing, as described above, had an undue influence upon the susceptible Ramos by steering his web browser to DanielDefense.com. Once inside Daniel's enticing web, Ramos was persuaded into scraping together $2,000 to purchase one of Daniel's most lethal and powerful weapons, despite having had no real-life experience with guns.

103.    Of course, Ramos did in fact spend countless hours virtually firing Daniel Defense rifles when binging on *Call of Duty*, and as such, in his imagination he had the necessary experience to engage with the real thing.

104.    Given that Daniel's deceptive and manipulative marketing presumptively had a significant role to play in the attack on Robb Elementary on May 24, 2022, were Daniel Defense to change its course and take reasonable steps to reform its marketing, such a change would greatly diminish the risk of future catastrophic mass shootings. Daniel Defense could easily reform its

practices by (1) tailoring its marketing to less vulnerable and impressionable consumers, (2) cease marketing through social media platforms with the predominant demographic of young prepubescent, adolescent and young adult males, (3) cease its reliance on combat imagery, and (4) affirmatively highlight the serious known dangers associated with its automatic weapons and their accessories. Such reforms would significantly contribute to the diminishment and prevention of mass shootings in the future.

105.    Daniel Defense's marketing tactics clearly meet the 'unfair' standard that is in direct violation of the Federal Trade Commission Act.

**2. Oasis Outback's Negligence in Transferring Firearms and Ammunition to Ramos Was a Proximate Cause of Harm to Plaintiffs.**

106.    On his eighteenth birthday, May 16, 2022, Salvador Ramos went online and made two purchases. Primarily, he paid $1,761.50 to purchase 1,740 rounds of ammunition for use in an AR-15 rifle from an online retailer. Secondly, he steered his browser to Daniel Defense's webstore, where he ordered a Daniel Defense DDM4 V7 AR-15-style rifle. Ramos requested that the DDM4 V7 be shipped to Oasis Outback, a gun store in Uvalde. Ramos paid $2,054.28 to purchase the rifle.

107.    The next day, May 17, 2022, Ramos went to Oasis Outback in person and bought a Smith & Wesson M&P15 assault rifle for $1,081.42.

108.    The day after, May 18, 2022, Ramos returned to Oasis Outback to buy an additional 375 rounds of AR-15 ammunition.

109.    Thereafter, on May 20, 2022, Ramos returned to Oasis Outback to pick up his Daniel Defense assault rifle. Upon information and belief, Ramos paid a $50 transfer fee to Oasis Outback in order to take possession of his Daniel Defense rifle. Thus, Ramos made three visits to Oasis within a four-day period. In that short period, Ramos had purchased and acquired over

$3,000 worth of guns and ammunition, including two AR-style rifles. Oasis Outback was required to report this multiple sale of rifles and ammunition to the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), pursuant to a letter issued by the ATF on July 12, 2011.  Fulfilling its reporting requirements, however, does not absolve Oasis Outback from its obligation to block a sale on other relevant grounds, including when Oasis Outback knew or reasonably should have known that the purchaser was likely to harm himself or others.

110.    On Ramos's May 20th visit to Oasis Outback to pick up his rifle, he also had employees install a holographic weapon sight on the rifle. Such a sight allows a user to look through a small glass window and see holographic crosshairs superimposed on a target. Holographic sights are designed for rapid short-range shooting and help users quickly acquire targets without having to undergo marksmanship training. Once the crosshairs highlight a target, the user can fire. Additionally, the rifle's holographic sight accessory permits shooters to keep both eyes open in order to identify more targets in their peripheral vision.

111.    Oasis Outback had a duty to refrain from selling weapons to the recently turned 18-year-old shooter, who it knew or reasonably should have known, was likely to harm himself or others.  The shooter was described by patrons of the store as displaying a nervous disposition and behaving suspiciously. One witness at the store said Ramos "appeared odd and looked like one of those school shooters." He was wearing all black, and was described as giving off "bad vibes." [11] The owner of Oasis Outback described him as alone and quiet, and questioned Ramos about how he could afford $3,000 worth of rifles. He also knew Ramos was urgently purchasing a massive arsenal of firepower within days of turning the legal age of 18 years old.  Nevertheless, Oasis, with

---

[11] H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 36 (Tex. 2022).

profit in mind, proceeded with the sale and sold this readily apparent troubled youth the rifles and ammunition.

112.    Oasis Outback knew or should have known that Ramos was not purchasing the assault rifles for recreational purposes. The shooter was purchasing two extraordinarily lethal assault weapons and enough ammunition to fight off a small army, as well as a holographic sight and Hellfire Gen 2 trigger system, all within days of his 18th birthday and for a cost that was incommensurate with his young age and disposition. Ramos' intended, non-recreational use of his purchases from Oasis hauntingly transpired four days later.

**B.  May 24, 2022 Robb Elementary School Shooting**

113.    On May 24, 2022, Robb Elementary was poised to celebrate the end of the 2022 school year with an awards ceremony for its students and parents. Believing that this would also be the day that his classmates from Uvalde High would reconvene at Robb Elementary as a traditional parting gesture before graduation, Ramos planned to attend and carry out his intended massacre. On that fateful morning, after a heated exchange with his grandmother over a mobile phone plan, Ramos shot his grandmother and set off in her truck towards Robb Elementary school.

114.    On route to Robb Elementary, on or about 11:28 a.m., Ramos, who apparently did not know how to drive, lost control of the truck which landed in a canal ditch. As the crash occurred in the vicinity of the Hillcrest Memorial Funeral Home, two employees walked over to be of assistance. Ascending from the canal ditch, Ramos began shooting at the two Hillcrest employees who fled for their lives back to the funeral home.

115.    Gathering his arsenal, Ramos proceeded to Robb Elementary's campus which was adjacent to where he crashed his grandmother's truck. Ramos easily traversed the school's five-foot perimeter fence which turned out to be a negligible deterrent to would-be intruders.

116.    Ramos was spotted by Coach Yvette Silva who was outside with her third graders. Ramos proceeded to shoot in the direction of Coach Silva who took cover and immediately reported an active shooter through her school radio at approximately 11:29 a.m.

117.    Ramos proceeded along the west side of the west school building and then entered the unlocked northwest door.

118.    Once inside the west building, Ramos walked down the hallway and stopped in front of Rooms 111 and 112. At approximately 11:33 a.m., Ramos fired his Daniel Defense AR-15 rifle towards Rooms 111 and 112. Thereafter, Ramos entered the door to Room 111 was unfortunately unlocked and unsecured.

119.    Once inside Room 111, Ramos rapidly fired over 100 rounds, both inside the room and the adjoining Room 112. After two and a half minutes, many students and two teachers were murdered. Many had died instantaneously while others died slowly. Ramos apparently had no prior experience with firearms and it was likely that the shooting on May 24, 2022 was the first time he fired a weapon.

120.    As the word trickled throughout the Robb campus that an active shooter was in their midst, the entirety of those on the Robb campus underwent lockdown, i.e., the teachers and students who first encountered Ramos in the playground went scurrying into empty classrooms, while those already in classrooms (or in the cafeteria) assumed the lockdown position of crouching down, away from the room's doors and windows. Thus, the student Plaintiffs, ranging from seven to ten years old, were forced to comprehend what was unfolding, including experiencing and overhearing gunshots, witnessing fellow injured and hysterical students, listening to and participating in the terror stricken whimpering and crying around them, and having to experience fear and dread alone within their own hearts and minds for a imponderable period of time. Thus,

these extremely young and impressionable children were forced to endure under these conditions for somewhere between sixty to seventy-seven minutes.

121.    Similarly, upon hearing that an active shooter was rampaging on their children's school's campus, Plaintiff parents' were beside themselves with anxiety and fear wondering if their child's life had been taken on account of yet another school shooting. In rushing over to Robb Elementary, many parents were faced with chaos and confusion when law enforcement forcefully prevented them from effectuating a rescue of their own children and/or requesting to receive some determination as to their children's well-being and safety. Other parents were unable to leave their employment and sat painfully wondering as to the fate of their children. The same fear and loathing gripped Plaintiff teachers and support staff who were not only fearing for their own lives, but the lives of the students they were charged with caring for.

122.    Nevertheless, after seventy-seven minutes of hell, law enforcement finally breached the classroom where Ramos was located and neutralized him with a barrage of bullets. Each second of those seventy-three minutes exponentially compounded the harms Plaintiffs' incurred to a degree that is unfortunately now indelibly etched into their hearts and souls.

### Plaintiff Jasmine C

123.    In the morning of May 24, 2022, Plaintiff **Jasmine C ("Ms. C"),** a CISD food service employee, was awaiting the arrival of one of the second grade classes in order to attend to her job of serving lunch.

124.    The morning of May 24, 2022 was a busy one in the cafeteria where the school hosted an award ceremony for its first, second and third grade students that finished around 11:00 a.m. Along with other student parents, Ms. C proudly watched her son, M.C. receive an award.

44

125.    After the proud parents left, the second graders filed in for their scheduled lunch period. After lunch service commenced, the school's janitor came storming into the cafeteria and in a frenzy, screamed, "Jasmine, run, run, hide, hurry, hurry." Having been unapprised of any emergency occurring on campus, Jasmine responded, "whoa, whoa, whoa, what's going on?" to which the janitor replied, "they're shooting, they're shooting, there's gunshots."

126.    Ms. C then heard gunshots. She immediately ran to the cafeteria's back door in order to lock it and while there, heard the pa-pa-pa-pa sound of gunshots. The children in the cafeteria were then guided up on the cafeteria's stage and instructed to remain absolutely quiet and to lie down. Ms. C panicked, thinking that her son, M.C. was outside in the playground near the location of where she heard the gunshots. Realizing this, the terrified Ms. Carrillo moved to leave the cafeteria and go outside to find her son. Ms. C's colleagues and other teachers had to restrain her, screaming, "you have to wait, you have to relax, you can get us all killed." Ms. C was beside herself, pacing back and forth, exclaiming "I have to save my son" while her colleagues were begging her to relax.

127.    Ms. C texted her boyfriend telling him to come to Robb Elementary and find M.C. as she was being restrained from leaving the cafeteria to find him. Soon thereafter, many students had been relocated into the cafeteria and directed towards the stage and into lockdown position. The children were hysterically crying, with their teachers trying to instill calm so as not to bring attention to themselves were the shooter to pass by the cafeteria.

128.    After approximately sixty minutes, law enforcement entered the cafeteria. They immediately instructed the teachers and students to take off running from the back door. The second graders were panicking and took off out the door upon the direction of their teachers.

45

129.    Law enforcement also instructed all teachers and staff, including Ms. C, to take off and run across campus. As she was running, one of the children ran in front of her and in order not to trample and fall over him, Ms. C crashed down onto her knee on the asphalt ground. The pain was excruciating but the adrenalin got her up immediately, and she continued to run.

130.    Meanwhile, Ms. C's ten-year old son, Plaintiff M.C., was terrified in lockdown with his fourth-grade friends in Room 103 when an officer shattered the classroom's window and screamed for the children to scramble out through the window. Terrified, M.C. propped himself up and out through the window. While doing so, a shard of glass lacerated his chest and drew blood. M.C. and his fellow classmates ran across the campus and were directed to the funeral home. M.C. was absolutely terrified, his shirt stained with blood. Upon arriving to the funeral home, M.C. had the wherewithal to call his mom's cellphone.

131.    After assisting others and jumping over the gate, Ms. C's phone rang. Her son spoke into the phone, crying "mommy, mommy, mommy, where are you?  I'm alive. I'm not dead. Come to the funeral home." Not sure where the funeral home was located, Ms. Carrillo immediately set off, asking others for directions.

132.    Arriving at the funeral home, law enforcement refused to locate M.C. for Ms. Carrillo. Ms. Carrillo felt tremendous pain in her knee from the fall when evacuating the cafeteria.

133.    Upon reuniting with Plaintiff M.C., Plaintiff Ms. C returned home with her son. Ms. C's knee puffed up like a balloon and the pain was excruciating.

134.    Meanwhile, M.C., who had to jump out the window of his class after Border Patrol smashed his classroom window, returned home traumatized. M.C. fell into a pattern of waking up terrified every two hours at night. He cried when he was alone and asked his mom to remain with

him all the time. M.C. pleaded with his mom, Ms. Carrillo to not take him back to school. M.C. kept asking his mom, "What if it happens again, and then this time, I do die?"

135.    In order to diminish the trauma and respond to M.C.'s needs, Ms. Carrillo and M.C. were forced leave Uvalde and relocate to Ms. C's home town of Del Rio, Texas. When arriving in Del Rio, M.C. was still too traumatized to return to school and has been home schooling. M.C. cowers in fear when he sees a police officer and/or alarms go off in his vicinity.

136.    After going to an orthopedic doctor, Ms. C was informed that she had torn the meniscus in her knee in two places and that surgery was absolutely necessary. Having lost her employment and associated health insurance, Ms. C has been forced to postpone the required surgery and endures the severe pain of attempting to walk with a torn meniscus.

137.    As such, Ms. C's long standing goal of becoming a law enforcement officer was now immeasurably attenuated, and perhaps shattered completely. She couldn't foresee how could she possibly pass the strenuous physical examination to become a proud law enforcement officer.

138.    In sustaining both the trauma of watching her son M.C. navigate through his own debilitating trauma, as well as her own compromised physical state from the injuries she sustained at Robb Elementary school, **Ms. C's** ability to provide her son with the care and assistance he needs has been exceedingly diminished.

### Class Student Representative, Plaintiff J.P.

139.    **Class Student Representative, Plaintiff J.P.** was in the classroom adjacent to where Ramos, with his Daniel Defense DDM4 V7, effectuated his murderous rampage. One of bullets struck his beloved fourth grade teacher, Elsa Avila in the abdomen. Her students, including J.P. were horrified but encouraged her teacher to hold on. Another of the bullets struck J.P.'s friend and sheared off a section of her nose. As J.P. and his classmates were hunched down in lockdown

position, J.P. and his classmates were torturously forced to endure the horror alone in their minds and bodies while listening to the crying, wailing and grimacing of students in their own room as well as through the walls into the carnage of Room 111. Having experienced bullets piercing through the walls and knowing that more could be arriving at any second, each subsequent minute of lockdown was an eternal hell for J.P. and his classmates.

### Parent Class Representative Andrea V.

140.     **Parent Class Representative Andrea V** received a call from her sister informing her that an active shooter nightmare was unfolding at Robb Elementary where her son and granddaughter were in attendance that morning. A.V. was in fourth grade and G.E. was in third grade. At first, Ms. Andrea V didn't believe her sister as there was nothing posted on the school's Facebook page which in the past, the school was sure to communicate. Panicking, Ms. Andrea V. drove in the direction of the school and after passing the school's street, drove towards the back of the school near the funeral home.

141.     At the funeral home, several parents and law enforcement were assembled. Ms. Andrea V. was determined to find her son but was thwarted by law enforcement. A woman was gathering the names of students from their parents and promised to determine whether they were safe. Ms. Andrea V. provided her children's names. Other parents were banging on the doors and windows looking for answers as to their children's safety. When the woman with the list returned and wasn't able to confirm A.V.'s presence, Ms. Andrea V panicked.

142.     Ms. Andrea V. forcefully screamed and cried, panicking that A.V. had been murdered. In pressing to determine if her son was alive, Ms. Andrea V. was able to receive word that A.V. was alive inside the school. After hearing that the school was going to load the children onto school buses and bring them to the Civic Center, Ms. Andrea V. left for the Civic Center to

see for her own eyes that A.V. was safe and sound. After lining up at the Civic Center, Ms. Andrea V was finally reunited with her son A.V. A.V.'s teacher told Ms. Andrea V. how proud she was of A.V.'s bravery and how strong he was during the experience.

## Teacher Class Representative Esther V.

143.    **Teacher Class Representative Esther V.**  heard the rattle of Ramos's gunshots from her special education classroom, Rooms 31-32. After hearing the gunshots, Ms. Esther V., a full time UCISD special education teacher with students ranging from 2nd through 4th grade, proceeded to the window and saw students and teachers scattering in all directions. Ms. Esther V. promptly locked the classroom's doors and shuttled her emotionally and physically disabled students into a closet within the classroom. After everyone was was accounted for, there were approximately thirteen students and teachers barricaded within the closet. Some of her special needs students understood what was happening and expressed their fear and confusion. Ms. Esther V. texted her nine-year old child's teacher to apprise her of the shooter and to determine if her child was safe and under her supervision. Ms. Esther V. received a text back from her child's teacher informing that she was not with the class as they were in the cafeteria having lunch.

## Support Staff Class Representative Sylvia U

144.    After receiving a dispatch at approximately 11:40 a.m. to proceed with her school bus to the funeral home adjacent to Robb Elementary on the morning of the shooting, **Support Staff Representative Sylvia U.,** upon arriving, found a chaotic and crazed scenario with parents screaming, law enforcement scurrying to and fro, an awaiting ambulance, and an impossibility to maneuver her large bus through the chaos. Prior to arriving at the funeral home, Ms. Sylvia U. was not informed what was happening at Robb. Dispatch merely informed her to pick up children at Robb and take them to Uvalde High School.

145.    It was only upon her arrival at the funeral home did she learn what was tragically unfolding. Panicked and unable to drive forward or backward, Ms. Sylvia U. locked her bus and awaited instruction from law enforcement. Sometime around 12:50 p.m., Ms. Sylvia U. heard a barrage of gunshots. Minutes thereafter, BORTAC officers, with bloodied children in their arms, came storming onto her bus with six profusely bleeding children. The officers set the children in the back of the school bus.

146.    Realizing that three of the six children were in a more critical state, BORTAC retrieved the three and carried them out to an ambulance. The three remaining children were also profusely bleeding with the BORTAC officer commanding Ms. Sylvia U. to quickly drive to the hospital. As the bus was blocked from going forward, law enforcement had to move vehicles and clear the traumatized and panicking parents to allow the bus to depart.   A police car escorted both the ambulance and Ms. Sylvia U.'s bus to the hospital. Upon driving out, Ms. Sylvia U. witnessed the bodies of the deceased children being lined upon the sidewalk, as well as EMS applying CPR in an attempt to save the life of one of the teachers.

147.    After finally arriving to the hospital and delivering the traumatized and bleeding children, Ms. Sylvia U. drove back in the direction of Robb Elementary with the BORTAC officer. She was then ordered to return to Robb Elementary to pick up children and deliver them to Uvalde's Civic Center. However, as her bus was covered in blood, both on the seats and throughout the entirety of the floors, Ms. Sylvia U. drove back to bus garage to pick up another bus.

148.    Upon arriving back to Robb Elementary, Ms. Sylvia U. witnessed a chaotic mass of teachers with their traumatized and screaming children and parents being held back by law enforcement. As the children were being loaded onto the bus, Ms. Sylvia U. saw many of the children that she regularly transported to school. The children were screaming and crying all the

way to the Civic Center. Upon arriving at the Civic Center, Ms. Sylvia U. witnessed parents clamoring to locate their children but were kept from reuniting with them by law enforcement until after the children entered the building. Parents were then requested to show proof that they were indeed their children's rightful parents.

149.    After dropping off the children at the Civic Center, Ms. Sylvia U. was required to return to Robb and pick up the remaining children. She did so and after making that last run to the Civic Center, Ms. Sylvia U. returned the bus to the bus garage, finally allowing herself to break down and express the horror that she had just experienced.

150.    Although Ms. Sylvia U. had been a bus driver for the Defendant UCISD for several years, the CISD had never provided training on the proper measures to take when executing school evacuations, let alone evacuations on account of active shooter scenarios

### Life Long Rupturing Damages

151.    On account of the experience in lockdown and the harrowing imagery of law enforcement in their 'Darth Vader' armored outfits commanding them to run for their lives from their classrooms and the alienating disorder of awaiting their parents to retrieve them, the Plaintiff students, as well as their parents, teachers, and support staff have each been exhibiting their own personal expressions of the post-traumatic stress that has irrevocably upended their daily lives.

152.    For example, Plaintiff, **Z.R.,** was ten years old in fourth grade when she was in lockdown in Room 109 at Robb Elementary. When Z.R. returned home and learned that her favorite cousin had been killed during the shooting on campus. Z.R. has been beside herself and in deep mourning and grief. She's now afraid to be alone and complains about undiagnosed physical pain. Z.R.'s parent, Plaintiff **Corina R.** incurred her own trauma when she learned of the school shooter's presence at Robb and whether her daughter was alive or dead. Now, that trauma

is exacerbated as she painfully watches how her vibrant and engaged daughter has descended into darkness.

153.    Plaintiff, **J.S.**, was eight years old in third grade when he was in lockdown in Room 19 at Robb Elementary. When he returned home, he began constantly exhibiting irrational fits of hysterical crying over matter-of-fact inconveniences. He also began exhibited an obsessive compulsive act of tying strings to the door so that the 'bad man' won't harm him. J.S.'s parent, Plaintiff **Jennifer C.** has incurred her own trauma when she learned of the school shooter's presence at Robb and whether her son was alive or dead. Now that trauma is exacerbated as she painfully watches how her son suffers unbridled hysterical outbursts and retreats into obsessive imaginary locations.

154.    Plaintiff **I.R.** was eight years old in second grade when he was in lockdown in Room 19 at Robb Elementary. When he returned home, I.R. would not leave his mother's side and refused to sleep in his own bed. I.R. attempted to undergo therapy but the memories and flashbacks that were elicited were too much. I.R. refuses to talk about or remember that horrifying day. Plaintiffs **George and Alma R.** have incurred their own trauma. Alma R. was at work when she learned of the shooter at Robb. As she was unable to leave her job, she endured hours wondering whether I.R. was safe. Still stuck at her job, she was unable to retrieve her son from the Civic Center and had to rely on her sister-in-law to reunite with I.R. Both George and Alma R. are fearful that her son has now been indelibly harmed.

155.    Plaintiff **L.R.** was nine years old in third grade on May 24, 2022 when she was in lockdown in Room 3 at Robb Elementary. When L.R. returned to her home, she immediately began wetting her bed which has been consistently recurring. L.R. becomes extremely emotional over small, inconsequential things, particularly when she has to depart from friends believing

that she'll never see them again. L.R.'s attention span has severely diminished as periodically she 'zones out' from conversations and interactions. L.R. has transformed from being a quiet, demure young girl to exhibiting temper tantrums and being intolerant of loud noises and voices and is triggered from watching action movies. Upon learning of an active shooter, L.R.'s father, **Frank R.** immediately drove the one hour distance to Uvalde obsessively imagining that he would arrive to find out that L.R. had been killed. Although that scenario did not ring true, both he and his wife, Plaintiff, **Luciene A**. have been heartbroken in watching the downward transformation of their daughter.

156.     Plaintiff **Z.A.** was nine years old in third grade on May 24, 2022 when he was in lockdown in room 2 at Robb Elementary. When Z.A. returned home, he refused to leave his mom's side. He constantly opens all the doors and refuses to be in the bathroom with the doors closed. Z.A. also insists that he will only attend a school where his mom works. Plaintiff Esther V. was working as a special education teacher at Uvalde on that fateful day. After hearing gunshots and observing students and teachers fleeing for their lives, **Esther V**. locked her classroom's door and  ushered her second through fourth grade developmentally disabled students in to a closet. Knowing that her son Z.A. was outside in the playground, her heart stopped wondering if he was o.k. She called Z.A.'s teacher but received no answer. When law enforcement finally liberated her classroom, Esther V. had to run across campus carrying while cradling one of her students. The combination of watching her son's fear induced behavior while recalling her own experience on that day has caused Esther V. a heightened fear of what other tragedy will next arrive.

157.     Plaintiff **M.T** was nine years old in third grade on May 24, 2022 when she was in lockdown in room 1 at Robb Elementary. Although back in school, M.T. wonders whether it is

safe to return to school. She worries that she'll experience a repeat of the chaos and horror that she experienced at Robb on May 24, 2022. M.T.'s mom, Plaintiff **Louanna R**. also wonders how the future will play out for her daughter given the horror she experienced at nine years old.

158.    Plaintiffs **B.G.** and brother **F.G.** were eight years old in third grade and seven years old respectively on May 24, 2022 when they both were outside on recess when the shooting commenced. Having to run for their lives upon the appearance of a man with a large gun, both B.G. and F.G. express recurring anxiety and constantly wonder when they will have to quickly run for their lives at any moment. The boys' mom, **Beatrice T.** also fears for her sons' future and their ability to feel safe as they mature in manhood**.**

159.    Plaintiff **J.L**. was seven years old in third grade on May 24, 2022 when he was outside on the playground at Robb Elementary at the time of the shooting. He, and his friends had to abruptly run upon his teacher's command. Thereafter, J.L. is hyper attentive to all loud noises and jumps when startled. J.L.'s mom, Plaintiff **Ashley L.** is saddened that her innocent young boy is now like a shell-shocked soldier.

160.    Plaintiff **J.D.** was ten years old in fourth grade on May 24, 2022 when he was in lockdown in Room 109 at Robb Elementary. When J.D. returned home, he's refused to return to school as he watched his teacher, Ms. Avila get shot. J.D. is unable to speak about what transpired on that fateful day and he has been unable to sleep. J.D.'s mom, Plaintiff **Sandra V.** wonders whether her son will ever return to his normal, happy go lucky self.

161.    Plaintiff **F.L**. was seven years old in third grade on May 24, 2022 when she was in lockdown hiding on the cafeteria's stage during the shooting. While on the cafeteria stage, F.L. was panicking and wanted her mom to come save her. Upon returning to home, F.L. does not want to return to school and wants her mom to remain constantly by her side. F.L.'s mother,

Plaintiff **Virginia G.** is fearful that by having experienced such a frightful event at such a young age whether F.L. will ever be able to trust that life will be happy and safe.

162.    Plaintiff **A.P.** was eight years old and in third grade on May 24, 2022 when he was out on the playground when the shooter arrived shooting. A.P ran to the nearest classroom and was separated from his other classmates. While in the classroom with students he didn't know, the students barricaded the door with chairs and desks. Upon arriving safely home, A.P. continues to reply the events in his mind as does his parents **Roman P.** and **Aracely P.** who, in going to the funeral home to wait for A.P., witnessed law enforcement forcefully prevent parents from attempting to rescue their children. The chaos of that scene, as well as the nightmare in retrieving A.P. from the Civic Center will forever plague their hearts.

163.    Plaintiff **A.L**. was eight years old in third grade on May 24, 2022 when she was outside of her classroom on recess when the shooting began. A.L. was quickly ushered into a classroom where she could see out the window and across the building to where the shooter was located. Upon returning home, A.L. began wetting her bed and refused to allow any doors to be closed. At night, she was petrified by the darkness. A.L.'s mother, **Crystal G.** was panic stricken upon learning that an active shooter had descended upon Robb Elementary. She immediately drove to the school but her entry was blocked by law enforcement. Although she observed that other students made it out of the school safely, she didn't reunite with her daughter until much later in the day. Crystal G. constantly imagines that her daughter did not make it out alive.

164.    Plaintiff **D.J.Q**. was eight years old in third grade on May 24, 2022 when in attendance outside on the school grounds near his classroom, Room 8. D.J.Q. saw and heard everything before scurrying into a classroom to hide. Upon returning home, D.J.Q. insists upon sleeping with his mom and needs her nearby at all times. D.J.Q. lost his dear friend during the

shooting and constantly asks his mother to take him to the cemetery. D.J.Q.'s health has deteriorated having recently been diagnosed with type one diabetes. D.J.Q's mom, Plaintiff **Yvette Q.** is beside herself, crying herself to sleep every night imagining that she could have lost her son and wonders whether she will ever be the same.

165.     Plaintiffs **J.P.** was seven years old and in second grade on May 24, 2022 when he was outside the building on recess. J.P. heard the initial car crash and thereafter, the gunshots. J.P's teacher ushered J.P and his classmates into Room 17 and had them bunch up together in a corner. The teacher proceeded to assemble a wall of desks and bookshelves around her students to protect them. Upon arriving at Robb Elementary. Plaintiff **Jasmin P.** witnessed the chaos unfolding at the funeral home. Upon arriving home, J.P. was terrified to sleep alone and repeatedly recalls the events of that tragic day.

166.     Plaintiffs **T.G.** was eight years old and in second grade on May 24, 2022 and was in lockdown attendance in Room 18 at Robb Elementary. T.G. was kneeling down in her classroom with the lights off wondering when the shooter was going to arrive and kill her. When T.G. returned home, she was afraid of the dark and had difficulty sleeping. T.G. kept continuously hearing all kinds of noises and was adamant that she didn't want to return to school. In hearing that an active shooter was on campus, Plaintiff **Jackie G.** headed off in school's direction and had a panic attack on route. Jackie G. was triggered upon seeing other parents pleading with law enforcement to determine whether their children were safe.

167.     Plaintiffs **R.F.** was nine years old and in fourth grade on May 24, 2022 when she was in lockdown in the school's cafeteria. During lockdown, R.F felt extremely anxious that she and the other students were exposed on the cafeteria's stage were the shooter to arrive. Upon arriving home, R.F. still wonders what would have happened were the shooter to arrive when all

the students were piled up on the stage.  Plaintiff **Monica O.** was extremely anxious when she was notified that an active shooter was at her daughter's school. She worries what kind of damage the experience has wrought on her daughter.

168.    Plaintiffs **A.V.** was nine years old in fourth grade on May 24, 2022 while in lockdown in Room 105. Upon returning home, A.V. expressed his concern with how and why people harm eachother. He wonders whether he or anyone can ever be sure of their safety. Plaintiff **Andrea V.** worries about her son's ability to feel safe and secure in the future.

169.    Plaintiff **J.P.** was ten years old and in fourth grade on May 24, 2022 when he was in lockdown in Room 109 at Robb Elementary. J.P. watched as his beloved teacher was shot in the abdomen from a bullet that flew through the wall from where the shooter was located. He also watched in horror as his classmate's nose was severed from a bullet coming from 'nowhere.' Similarly, J.P. heard the screaming and moaning coming from Room 111, the room next to his classroom where the shooter killed so many of his classmates. Upon returning home, J.P. obsessively ensures that all the doors to his house are locked and the window blinds drawn. J.P. constantly wanders the house making sure that his parent, Plaintiffs **Daniel** and **Crystal P.** are safe and available. Plaintiffs' Daniel and Crystal P. are traumatized watching their otherwise happy-go-lucky son act in an obsessive and compulsive manner which they are powerless to remedy.

170.    Plaintiffs **N.S.** was nine years old and in third grade on May 24, 2022 when he was in lockdown in Room 12 at Robb Elementary. He was forced to sit in the dark and remain quiet despite constantly asking his teacher to telephone his mother. His teacher kept refusing over and over. Upon returning home, N.S. learned that his cousin had been killed. N.S.'s mom, Plaintiffs **Alieta P.** was panicked to hear that an active shooter was on her son's campus. On that

day, Alieta P. was working at a health clinic nearby Robb Elementary which was also placed under lock down. After lockdown was lifted, Alieta rushed over to the school and witnessed the children's bodies being brought out of the classroom. Alieta P. was beside herself as she couldn't find N.S. Upon reuniting with him, Alieta P. was unable to sleep for an entire week as the fate of her nephew had not been determined. Plaintiff **Maria P.**, N.S.'s grandmother's health has been greatly impacted upon the anxiety and worry she experienced on May 24, 2022 and thereafter.

171.    Plaintiffs **A.L.A.T** was ten years old and in fourth grade on May 24, 2022 when she was outside leaving school accompanied by her biological father. Upon hearing the shots, A.L.A.T and her biological father ran for their lives through the parking lot next to the building where the shooter was located. When A.L.A.T. returned home, she found out that her best friend was killed on that day. A.L.A.T. is continually texting her mother, **Cassandra B.**, who, on that day was prohibited by her employer to leave work and go to her daughter's school. Cassandra B. is concerned that the loss that her daughter incurred will prevent her from forming close friendships or relations in the future.

172.    Plaintiff **G.D.G.R.** was seven years old and in third grade on May 24, 2022 while on lockdown at Robb Elementary. Upon returning home, G.D.G.R. expresses a concern for her safety by always checking to see who is in her immediate presence. Her mom, Plaintiff **Cynthia R.** worries that her daughter is permanently damaged**.**

173.    Plaintiff **J.M.** was nine years old and in fourth grade on May 24, 2022 when under lock down at Robb Elementary. J.M. shows signs of insecurity and insularity after the events of May 24, 2022.  Plaintiffs **Sandra and Martin M.** have sadly observed the changes in their daughter.

174.    Plaintiff **Maria G.R.** was a bus driver for the Uvalde School District on May 24, 2022 while on location at Robb Elementary. Maria G.R. was dispatched to Robb Elementary school without being told that she was responding to a school shooting. Upon arriving to the funeral home, Maria G.R. was astounded to find law enforcement and chaotic and terrified parents clamoring for information from law enforcement as to the safety of their children. Maria G.R.'s bus was boxed in so she was unable to move. Immediately thereafter, law enforcement came barging onto her bus with six bleeding children in their arms. They marched to the back of the bus and laid the children down. Thereafter, law enforcement removed three of the children and was ordered to take the remaining three children to the hospital. With a police escort and seriously injured children in the back of her bus, Maria G.R. drove rapidly to the hospital. After dropping off the children, she was dispatched back to Robb Elementary. However, given that her bus was soaked with blood, she had to return it to the garage and swap out another bus. She did so and after making two runs to the Civic Center with full busloads of hysterical and terrorized children, Maria G.R. broke down sobbing after the events that she had just experienced.

175.    Plaintiff **Vanessa G.** was a bus driver for CISD on May 24, 2022 while on location at Robb Elementary. Vanessa G. was dispatched to Robb Elementary to pick up and transport children from the school to the Civic Center in order to be reunited with their parents. Although the children on her bus expressed joy and happiness in heading home after a school day, the trips to the Civic Center were filled with crying and screaming. After making two runs to the Civic Center, Vanessa G. was deeply impacted by sadness and horror in which she had just observed.

176.    Each of the above Plaintiffs suffered damages that despite being incorrectly designated as emotional, were in fact physical harms wherein the traumatic events experienced

resulted in palpable brain injuries caused by physical alterations of the brain on account of the production of excessive brain chemicals such as Cortisol that are medically and scientifically known to a great probability to cause Post Traumatic Stress Disorder ("PTSD").

177.    Dr. David Spiegel, M.D., Associate Chair of Psychiatry & Behavioral Sciences and endowed Professor at Stanford University School of Medicine provides the following analysis illuminating the otherwise false dichotomy between physical and psychological damages when such applies to Post Traumatic Stress Disorder.

178.    Dr. Spiegel opines:

"The experience of exposure to life-threatening trauma is both a mental and a physical injury that cannot be separated. Children who witnessed their friends being shot, wounded and killed have been forever changed. Their previously safe environment was suddenly turned into a chaotic and bloody nightmare. Adults who were supposed to protect them were either themselves injured or killed, or failed to provide protection and safety. Their world was turned upside down. If this could and did happen in their school, it could happen anywhere, at any time. Studies show that exposure to trauma in childhood puts these children at greater risk of developing PTSD after exposure to trauma later in life. This means that their brains suffer damage that becomes apparent later in life with further trauma exposure, like a broken leg that has not healed perfectly and is more likely to break again with milder trauma.

The distinction between such mental and physical damage is artificial at best. The brain is a part of the body, regulates and receives information from every part of the body, and is permanently altered by the experience of trauma. As the organ that records and reacts to experience, it suffers damage from exposure extreme experience of threat and violence. The brain is profoundly affected by stress, leading to chronic dysregulation of stress hormones such as cortisol and epinephrine, disruption of sleep through hyperactivation of the sympathetic nervous system, and alteration in the relationship between the prefrontal cortex which controls executive functions, and the limbic system, which manages emotion and memory. It has long been known that 'neurons that fire together wire together,' so events that profoundly alter experience cause the brain to reconfigure. The brain never entirely heals from exposure to trauma, making it more sensitive to subsequent even relatively minor trauma exposure. The brain records, reacts to and coordinates response to traumatic experience. It is changed by those experiences.

The damage done by trauma exposure is not limited to brain function. Decades of research on adverse childhood experiences demonstrates that trauma exposure in childhood produces lifelong lasting physical damage. Those who have suffered such

experiences make more subsequent medical and emergency room visits decades later. Exposure to life-threatening violence as a child results in damage to the body that becomes apparent years later with earlier onset of many serious illnesses, including more severe cardiovascular and lung disease as well as subsequent psychiatric illness well into adult life. The children exposed to this murderous rampage have literally been scared to death, and their subsequent physical as well as mental health has been damaged.

I hold the above opinions to a reasonable degree of medical certainty.

David Spiegel, MD. See Exhibit A, "Damage to Brain and Body during Uvalde Shooting," dated November 28, 2022.

## CLASS ALLEGATIONS

179.    Pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2), Plaintiffs bring this action as a class action on behalf of themselves and all other similarly situated (1) students, teachers and support staff who were located within the perimeter of Robb Elementary school's campus on May 24, 2022 and (2) the students' parents regardless of their location on May 24, 2022. The danger posed to the lives, health, and safety of these class plaintiffs was exponentially increased on account of (1) Defendant Daniel Defense's illegal, reckless, and negligent actions of unfairly marketing its AR-15 rifles, including its DDM4 V7 rifles, which encouraged the young, disaffected Ramos and other civilian consumers to illegally misuse their products in offensive, military-style operations and (2) Defendant Oasis Outback LLC's inexcusable negligence in transferring firearms and ammunition to Ramos. Plaintiffs reserve the right to amend these putative class definitions as discovery or other case circumstances may warrant.

180.    Alternatively, to the extent that the Court should find that a class is unavailable, Plaintiffs reserve the right to designate their action as a mass action pursuant to the requirements of 28 U.S.C. § 1332(d).

181.    Class certification is appropriate because the class sought to be certified is more than sufficiently numerous to make joinder impractical. The number of members in the putative

Class is great, but not so great as to make the class unmanageable. It is therefore impractical to join each Class member as a named plaintiff. While the exact number of Class members is not yet known, there are a significant number of similarly situated students, teachers, school support staff, and parents such that utilization of a class action is the most economically feasible means of litigating the merits of this action.

182.    Class certification is appropriate because Plaintiffs and their counsel are adequate class representatives. Like all members they seek to represent, Class Representative Plaintiffs were located on or nearby the Robb Elementary campus(or with respect to Parents class members had children on campus) on May 24, 2022 between the prescribed hours; and on account of Defendants conduct caused and exacerbated the debilitating harms that they will have have to endure for the balance of their lives. Plaintiffs' counsel is experienced in class action litigation, including having engaged in previous class-wide litigation and will therefore more than adequately represent the interests of putative class members.

183.    Class certification is appropriate because Plaintiffs' action raises common questions of fact or law, whose means of proof predominates over questions that may call for individual adjudication. Among these predominating common questions of fact or law are, but not limited to:

(a)    Whether Defendant Daniel Defense, through the marketing of its firearms, munitions and accessories, including its AR-15-style rifles, to civilian purchasers, including thrill-seeking, impulsive and susceptible teens and young men who are attracted to violence and military fantasies, encouraged the illegal and dangerous misuse of its products by implying that civilians can use their weapons for offensive combat-like missions,

(b)    Whether said marketing violated the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), by knowingly engaging in unfair trade practices that are

exempted from the immunity otherwise conferred under the Protection of Lawful Commerce in Arms Act, 15 U.S.C. § 7902;

(c)  Whether by marketing the illegal misuse of its products, Daniel Defense violated the FTC Act, which prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1).

(d)  Whether Defendant Oasis Outback, a licensed purveyor of firearms, failed to exercise reasonable care in selling and transferring firearms, including AR-15-style rifles to an outwardly appearing suspicious young man who, despite obtaining the age of majority a few days earlier, spent thousands of dollars on multiple guns and large quantities of ammunition over a four-day period and as such, presented a reasonable likelihood that he would use the transferred products in a manner that posed an unreasonable risk of physical injury to other persons;

(e)  Whether such facts and circumstances warranted the exemption of immunity conferred by the Protection of Lawful Commerce in Arms Act, 15 U.S.C. § 7902.

184.  Class certification is appropriate because Plaintiffs' claims are typical of the claims asserted on behalf of the putative class members. All claims asserted by Plaintiffs are also asserted on behalf of all class members, and there are no conflicts of interest that render Plaintiffs' claims or interests atypical of the claims or interests of the class members. Each class member has suffered the same type of damages and have incurred similar actual damages on account of Defendants' conduct and are of a similar type and amount to the actual damages suffered by each class member.

185.  Class certification is appropriate because class-wide adjudication of the claims alleged by Plaintiffs is superior to separate adjudication by individual class members, which may yield conflicting results, judgments, and obligations. In accordance with Fed.R.Civ.P. Rule 23(b)(2), prosecutions of separate actions by individual members of the class would create a risk of adjudications with respect to individual members of the class which would, as a practical matter, substantially impair or impede the interests of the other members of the class to protect their interests.

186.    Also in accordance with Fed. R. Civ. P. Rule 23(b)(3), the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and this class action is superior to other available methods for the fair and efficient adjudication of the controversy between the parties.

187.    Further, the costs of litigating this action against municipal and state actors renders individual litigation impractical and unfeasible, thereby rendering class-wide adjudication a superior means of resolving the claims alleged in this Class Action Complaint.

188.    Lastly, class certification is most appropriate because Defendants have acted in a manner where injunctive and/or declaratory relief would be instrumental in precluding future harm as it impacts the class as a whole.

## VI.
## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Negligence and Gross Negligence**
*(By Plaintiffs Against Defendant Daniel Defense)*

189.    Plaintiffs incorporate and re-allege the above paragraphs as if stated fully here.

190.    Defendant Daniel Defense was subject to the general duty imposed on all persons not to expose others to reasonably foreseeable risks of injury.

191.    Defendant Daniel Defense had a duty to exercise reasonable care in selling, offering for sale, marketing, and shipping its firearms, including AR-15 rifles, and to refrain from engaging in any activity creating reasonably foreseeable risks of injury to others.

192.    Defendant Daniel Defense's marketing of its AR-15 firearms breached its duty to exercise reasonable care. The company's marketing encouraged the illegal and dangerous misuse of its AR-15 firearms by marketing assault weapons to the civilian purchasers, via social media, with violent and militaristic imagery that unfairly and illegally implied that civilians can use their

weapons for offensive combat-like missions. Such marketing was intentionally created to appeal to the thrill-seeking and impulsive tendencies of susceptible teens and young men who are attracted to violence and engage militaristic ideation and fantasies. Aside from the notoriety achieved through product placement of its DDM4 V7 assault rifle into the popular video game, *Call of Duty*, much of Daniel Defense's illegal marketing strategy is profit-driven.  Both Daniel Defense and *Call of Duty's* owner, Activision have profited significantly from their collaboration.

193.    On or about May 16, 2022, Defendant Daniel Defense sold its rifle to Ramos who relied upon it to undertake a mass shooting at at Robb Elementary.

194.    Ramos's acquisition and illegal use of the Daniel Defense DDM4 V7 was a direct result and foreseeable consequence of the manner in which the company marketed its AR-15 products.

195.    Each of the above acts or omissions by Defendant Daniel Defense constitutes negligence and/or gross negligence, and that negligence was a proximate cause of the injuries sustained by Plaintiffs.

196.    By engaging in unfair trade practices, Defendant Daniel Defense knowingly violated the Federal Trade Commission Act, 15 U.S.C. § 45(a). This claim is thus exempted from immunity conferred by the Protection of Lawful Commerce in Arms Act, 15 U.S.C. § 7902

197.    Daniel Defense's marketing practices were unfair because they encouraged the illegal misuse of their AR-15 product through their deliberate and intentional marketing campaign and strategy as described above. This foreseeably caused or was likely to cause substantial injury to consumers and foreseeable victims of gun violence by increasing the risk that disaffected adolescent and young men predisposed towards committing acts of mass

violence will carry out those acts by encouraging them to purchase and acquire exceedingly lethal weapons such as the Daniel Defense DDM4 V rifle.

198.     Plaintiffs were consumers who could not reasonably avoid the injuries caused by Daniel Defenses marketing practices. Plaintiffs were without the means to avoid the risks that a Daniel Defense consumer would undertake a scenario reflected by Daniel Defense's marketing, i.e., the carrying out a combat operation against civilians.

199.     The increased risk of mass violence perpetrated by adolescent and young men caused by Daniel Defense's marketing practices is not outweighed by any countervailing benefits to consumers or competition. Daniel Defense could cease marketing its AR-15 rifles to adolescent and young men through appeals to the military and the offensive combat capabilities of its rifles without creating a burden on itself or any other individual or entity. Instead, it has continued these activities after being confronted with the tragic consequences of its marketing strategy.

200.     Ramos' purchase of the especially lethal and destructive Daniel Defense DDM4 V7 rifle to carry out the massacre at Robb Elementary was, upon information and belief, influenced by Daniel Defense's marketing as described above, and the result was a more lethal attack, more carnage, and greater pain and suffering.

201.     These knowing violations of the FTC Act were a proximate cause of Ramos's purchase and decision to use the Daniel Defense DDM4 V7 rifle and the physical pain, mental anguish, and emotional suffering that Plaintiffs have incurred.

202.     Daniel Defense's negligence proximately caused Plaintiffs to incur physical and emotional harm including the diminishment of the love, support, nurturing, and companionship with friends, families and communities that they thrived upon prior to the mass shooting at Robb Elementary.

203.     Daniel Defense also caused, through its negligence, Plaintiffs to suffer and continue to suffer economic losses, including considerable financial expenses for medical and mental healthcare and treatment, and diminished income capacity, and they will continue to incur these losses and expenses in the future.

## SECOND CAUSE OF ACTION
Negligence Per Se
*(By Plaintiffs Against Defendant Daniel Defense)*

204.     Plaintiffs incorporate and re-allege the above paragraphs as if stated fully here.

205.     In addition to manufacturing firearms, Daniel Defense is a "dealer" of firearms, as defined in 18 U.S.C. § 921(a)(11).

206.     By marketing the illegal misuse of its products, Daniel Defense violates the FTC Act, which prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). An unfair act or practice "causes or is likely to cause substantial injury to consumers which is not reasonably avoided by consumers themselves and not outweighed by countervailing benefits to consumers or competition."  15 U.S.C. § 45(n).

207.     Daniel Defense marketed its rifles in a manner that encourages illegal activities, namely engaging in offensive combat, against civilians, on American soil. It targets this marketing at the group most likely to engage in violent and/or impulsive behavior: adolescent and young men.

208.     These marketing practices proximately caused the harms suffered by Plaintiffs.

209.     Plaintiffs were consumers who could not reasonably avoid the injuries caused by these marketing practices.

210.     The risk of injury from Daniel Defense's marketing is not outweighed by benefits to consumers or competition. Daniel Defense chose to push the envelope in its marketing strategy

to gain "notoriety." There is no reason Daniel Defense could not focus its marketing on the lawful uses of its products.

211.    Plaintiffs were within the class of people that the FTC Act is designed to protect. This claim is thus exempted from immunity conferred by the Protection of Lawful Commerce in Arms Act, 15 U.S.C. § 7902.

### THIRD CAUSE OF ACTION
**Negligent Transfer**
(*By Plaintiffs Against Defendant Oasis Outback, LLC*)

212.    Plaintiffs incorporate and re-allege the above paragraphs as if stated fully herein.

213.    Defendant Oasis Outback had a duty to exercise reasonable care in transferring firearms, including AR-15 rifles, and to refrain from engaging in any activity creating reasonably foreseeable risks of injury to others.

214.    Defendant Oasis Outback's transfer of the Daniel Defense DDM4 V7 rifle to Ramos breached its duty to exercise reasonable care.

215.    Despite his youth and having just turned 18 days before, Ramos spent thousands of dollars on multiple guns and large quantities of ammunition at and through Oasis Outback over a four-day period. This was so sufficiently unusual that it caused Oasis Outback's owner to question Ramos as to where he amassed the money to make such a sizeable purchase.

216.    Other patrons at the store noticed Ramos acting unusual and nervous during his repeat visits. Ramos was dressed in all black which was highly unusual in Uvalde, Texas and, as one customer described him, he looked "like one of those school shooters."

217.    Oasis Outback knew or reasonably should have known that Ramos was a dangerous person who was likely to use the rifle for unlawful purposes, including to injure and kill people.

218.    Oasis Outback enhanced the dangerousness of the rifle it transferred to Ramos by installing a holographic sight.

219.    It is well established that Oasis Outback, as a purveyor of firearms, has the right to refuse service to anyone.

220.    Oasis Outback is a licensed seller of firearms. It transferred a firearm to Ramos when it knew, or reasonably should have known, that the Ramos, as the person procuring the the firearm, was likely to use the product in a manner involving unreasonable risk of physical injury to other persons. As such foreseeable events did take place, this claim is thus exempted from immunity conferred by the Protection of Lawful Commerce in Arms Act, 15 U.S.C. § 7902.

221.    These acts were a but for and proximate cause of Plaintiffs' physical and emotional injuries, as well as their substantial and unnecessary physical pain and emotional suffering.

222.    Oasis Outback also caused, through its negligence, Plaintiffs to suffer and continue to suffer economic losses, including considerable financial expenses for medical and mental healthcare and treatment, and diminished income capacity, and they will continue to incur these losses and expenses in the future.

**FOURTH CAUSE OF ACTION**
**Negligent Sale**
*(By Plaintiffs Against Defendant Oasis Outback, LLC)*

223.    Plaintiffs incorporate and re-allege the above paragraphs as if stated fully herein.

224.    Defendant Oasis Outback had a duty to exercise reasonable care in selling firearms and ammunition, including AR-15 rifles, and to refrain from engaging in any activity creating reasonably foreseeable risks of injury to others.

225.    Defendant Oasis Outback's sales of ammunition and an AR-15-style rifle to Ramos breached its duty to exercise reasonable care.

226.    Despite his youth and having just turned 18 days before, Ramos spent thousands of dollars on multiple guns and large quantities of ammunition at and through Oasis Outback over a four-day period, which was so sufficiently unusual that it caused Oasis Outback's owner to question Ramos as to where he amassed the money to make such a sizeable purchase.

227.    Other patrons at the store noticed Ramos acting unusual and nervous at the store during his repeated visits. Ramos dressed in all black which was highly unusual in Uvalde, Texas and, as one customer described him, he looked "like one of those school shooters."

228.    Oasis Outback knew or reasonably should have known that Ramos was a dangerous person who was likely to use the firearms and ammunition for unlawful purposes, including to injure and kill people.

229.    It is well established that Oasis Outback, as a gun purveyor, has the right to refuse service to anyone.

230.    Oasis Outback is a licensed seller of firearms. It sold ammunition and a firearm to Ramos when it knew, or reasonably should have known, that the person to whom the ammunition and firearm being supplied, Ramos, was likely to use the product in a manner involving unreasonable risk of physical injury to other persons. As such foreseeable events did take place, this claim is thus exempted from immunity conferred by the Protection of Lawful Commerce in Arms Act, 15 U.S.C. § 7902.

231.    These acts were a but for and proximate cause of Plaintiffs physical and emotional injuries, as well as her substantial and unnecessary physical pain and emotional suffering.

232.    Oasis Outback also caused, through its negligence, Plaintiffs to suffer and continue to suffer economic losses, including considerable financial expenses for medical and mental

healthcare and treatment, and diminished income capacity, and they will continue to incur these losses and expenses in the future.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray that the Court will:

1. Issue a judgment declaring that Daniel Defense's marketing campaign, that targets young impressionable youth by intentionally leading them to believe that the guns and tactics relied upon for Military combative missions are transferable and applicable to civilian non-combative interactions, is in patent violation of the Federal Trade Commission Act, 15 U.S.C. § 45(a);

2. Issue a judgment declaring that Daniel Defense's marketing campaign that insinuates that the guns used in militaristic and combative settings are applicable to non-militaristic, non-combative settings was the proximate cause of Plaintiffs' physical and psychological harms;

3. Enjoining Daniel Defense, Inc. from perpetuating its marketing campaign directed at young, underage youth wherein it irresponsibly dismisses and makes light of the dangerousness of their firearms by implying that (1) their use in a military combative mission is applicable and transferable to a civilian noncombative environment and (2) they are a plaything or toy and/or their impact is comparable to the ramifications of videogame;

4. Requiring Daniel Defense to provide a clear and conspicuous warning cautioning its youth demographic that the militaristic and combative measures depicted in its advertisements and associations with first person shooter games are not transferable nor applicable to nonmilitary, noncombative civilian interactions;

a) Award Plaintiffs monetary damages in the amount of Six Billion Dollars ($6,000,000,000);

b) Award Plaintiffs and against Defendants' Daniel Defense, Inc., Oasis Outback, LLC., and Does 1-3,000, to the extent that their liability is based upon reprehensible actions and/or inaction undertaken in their individual capacities, Punitive Damages, in an amount which is fair, just and reasonably designed to punish and deter said reprehensible conduct, to be determined at trial;

c) Award all Plaintiffs, including the members of the class, reasonable attorneys' fees;

d) Award all Plaintiffs, including the members of the class, costs of suit, including pre-and post-judgment interest;

e) Award such other and further relief as this Court may deem appropriate and equitable, including injunctive and declaratory relief as may be required in the interests of justice.

Dated:  February 22, 2023                Respectfully Submitted,

                                         /s/Charles A. Bonner


**RYDER LAW FIRM**                       **LAW OFFICES OF BONNER & BONNER**
**JESSE RYDER (***pro hac forthcoming***)**   CHARLES A. BONNER
6739 Myers Road                          CABRAL BONNER
E. Syracuse, NY 13057
Tel: (515) 382-3617                       475 Gate Five Rd., Suite 211
e-mail: ryderlawfirm@gmail.com           Sausalito, Ca 94965
                                         Tel: (415) 331-3070
**EVANS LAW OFFICE P.P.L.C.**            Fax: (415) 331-2738
JERRY EVANS                              e-mail: cbonner799@aol.com
127 N. West Street                       e-mail: cabral@bonnerlaw.come-mail:
Uvalde, Texas 78801                      e-mail: eseifert00@hotmail.com
Tel: (830) 900-5021
e-mail: devanslawoffice@gmai.com         **Legal Center of Jose Angel Gutierrez, P.C.**
                                         JOSE ANGEL GUTIERREZ
**THE BONNER LAW FIRM, P.C.**            429 W. 12th Street,
VICTOR BONNER                            Dallas, Texas 75208
4820 Old Spanish Trail                   Tel: 214-745-5400
Houston, Texas 77021                     e-mail: joseangelgutierrez@yahoo.com
Tel: (832) 433-6565
e-mail: vmbonner@yahoo.com